IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,      )
                               )      Case No. 1:23-cr-7
       v.                      )
                               )
PREONTE TERRAN SANDERS         )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**Susan Paradise Baxter, United States District Judge**

Defendant Preonte Terran Sanders ("Sanders") stands accused in this case of possessing fentanyl and methamphetamine, with intent to distribute same. These charges were filed after Sanders was found to be travelling on December 31, 2022 in an Uber vehicle that held suitcases allegedly containing drugs. Following a vehicle stop, Sanders was taken to the state police barracks where he was questioned and made statements to the investigating agents. Pending before the Court is Sanders' motion to suppress the evidence obtained by law enforcement officers on December 31, 2022. The parties have briefed Sanders' motion, and the Court held an evidentiary hearing on December 20, 2023.

At the suppressing hearing, the Government presented testimony from Pennsylvania State Troopers Jonathan Matson, Gary Knott, and Adam Mourer. Each of these officers was involved in some aspect of the events giving rise to Sanders' detention and the ensuing interview. Sanders did not present testimony in support of his suppression motion, but his counsel did cross-examine each of the Government witnesses and offered argument on his behalf.

Apart from testimony, the prosecution offered into evidence a video recording of the challenged traffic stop (Government Exhibit "A"), the waiver-of-rights form that Sanders executed at the state police barracks (Government Exhibit "B"), and the search warrant

1

application and affidavit of probable cause relating to the luggage that was confiscated from

Sanders' Uber vehicle (Government Exhibit "C"). Sanders' counsel identified as an exhibit the

affidavit of probable cause that Trooper Mourer submitted in support of the initial criminal

complaint. (Defense Exhibit "1"). Although this document was not admitted in evidence, its

contents were read into the record.

The Court has had an opportunity to review the entire record and consider the parties'

respective arguments. Having listened to the testimony of the Government's witnesses and

observed their demeanor, the undersigned finds the testimony of Troopers Matson, Knott, and

Mourer to be credible. Each of the witnesses demonstrated a good recollection of the events in

question. Their respective accounts were believable, consistent, and corroborated by other

evidence in the case. To the extent defense counsel challenged the credibility of the troopers'

testimony, the Court finds those challenges unpersuasive.

The Court also finds the affidavit that Trooper Mourer submitted in support of the search

warrant for the luggage to be a reliable accounting of the agents' investigation. The affidavit

was sworn to by Trooper Mourer and is consistent with the testimony and evidence received by

the Court. Sanders has not raised a *Franks* challenge as to any aspect of the probable cause

affidavit, even though his counsel had an opportunity to question Trooper Mourer at the

suppression hearing. As reliable hearsay evidence, Trooper Mourer's affidavit may be

considered by the Court for the purposes of resolving the pending suppression motion. *See*

*United States v. Raddatz*, 447 U.S. 667, 679 (1980) ("At a suppression hearing, the court may

rely on hearsay and other evidence, even though that evidence would not be admissible at

trial."); *United States v. Lora*, No. 3:16-CR-91, 2019 WL 346410, at *5 (M.D. Pa. Jan. 28, 2019)

(suppression hearing court considered an affidavit submitted in support of a tracking warrant), *aff'd*, Case No. 20-3586, 2021 WL 4622255 (3d Cir. Oct. 7, 2021)).

Based on the foregoing credibility determinations, the Court now makes the following findings of fact and conclusions of law.

## I.   FINDINGS OF FACT

1. Trooper Jonathan Matson has been employed by the Pennsylvania State Police ("PSP") since 2007. For the last ten years, he has been assigned to PSP's Bureau of Criminal Investigations, Drug Law Enforcement Division, where he has been involved in the identification and dismantling of large-scale drug trafficking operations. During much of that time, he has been federally deputized to work with the FBI or the DEA on various drug enforcement groups. Thus, his primary focus is in the area of drug investigations. ECF No. 59 at 11.

2. In March 2021, federal postal inspection agents advised Trooper Matson of a parcel containing approximately three pounds of crystal methamphetamine, which had been sent through the U.S. mail and was addressed to an apartment located at 905 East Grandview Boulevard, in the City of Erie. ECF No. 59 at 12-13. Trooper Matson participated in a surveilled controlled delivery to the East Grandview Boulevard residence and observed Sanders receiving the package at that address. *Id.* at 13. Agents obtained a search warrant for the residence and subsequently recovered, among other things, blue fentanyl pills, $20,000 in currency, and a pistol. *Id.* at 13. At the time of the search, Sanders was observed running out of a room where a distinctive tee-shirt displaying the word "drip" was found. *Id.* at 13-14. Surveillance footage obtained from the U.S. Postal Inspection Service appeared to show Sanders

3

shipping the subject package from Arizona while wearing the same distinctive "drip" shirt that was recovered from the East Grandview Boulevard residence. *Id.* at 13-14.

3. In May 2021, based on the foregoing events, Sanders was indicted in the Western District of Pennsylvania for attempting to possess methamphetamine, with intent to distribute. After pleading not guilty, he was released on an unsecured bond under the care of a third-party custodian. The conditions of his release were later modified in August 2021 to allow his return to Phoenix, Arizona, so that he could reside with his girlfriend and their children. *See United States v. Sanders*, Case No. 1:21-cr-23, at ECF Nos. 3, 4, 17, 20, 22, 23, 30; *see also* ECF No. 59 at 14.

4. In October 2022, a task force agent based in Cleveland informed Trooper Matson that Sanders had been involved in a suspicious pattern of flights between Arizona and Cleveland. ECF No. 59 at 14-15. Based on his training and experience, Trooper Matson was aware that analyzing travel patterns is a common investigative technique for discerning drug trafficking activity. *Id.* at 15. According to Trooper Matson, people who are couriers or traffickers oftentimes book their flights shortly before the flight takes off and then make quick return flights. *Id.* Drug traffickers will often purchase a plane ticket for their courier and pay the courier to physically move the drugs while traveling on the same flight in order to oversee the transaction and ensure that the sales proceeds are returned. *Id.* at 16. The head of the drug association will often stay back and communicate via phone while the courier physically moves the drug packages. *Id.* at 17. In this manner, the courier can "take the hit," rather than the head of the organization, if the police step in. *Id.*

5. Trooper Matson learned in October 2022 that Sanders had engaged in a series of flights between Arizona and Cleveland, typically purchasing his ticket to Cleveland on the day of

his flight or the day before, and then booking a return flight to Arizona the next morning,

sometimes spending less than 24 hours at his flight destination. ECF No. 59 at 15-16. Trooper

Matson was also aware of a particular email address associated with these flight bookings, and it

revealed that several other individuals were booked on the same flight as Sanders. *Id.* at 16.

Trooper Matson interpreted these circumstances as consistent with drug trafficking activity,

warranting further investigation. *Id.*

      6. In November of 2022, Trooper Matson came into contact with a confidential

informant ("CI"), who advised that Sanders was the head of a large-scale drug trafficking group.

ECF No. 59 at 18. The CI stated that Sanders often flew in large amounts of contraband from

Arizona to Cleveland; then, either Sanders or his courier would bring the drugs to the Erie area

by Uber or rideshare. *Id.* at 18, 20. The CI related that, in every instance of which the CI was

aware, the drugs had been transported in suitcases. *Id.* at 20. This same individual identified

different hotels and locations where the couriers would meet up with local drug dealers to

exchange the drugs and the money. *Id.* at 18-19. In addition, the CI showed Trooper Matson

electronic communications from Sanders that contained information relative to drugs. *Id.* at 19.

      7. In December of 2022, Trooper Matson's investigation into Sanders' suspected

trafficking began to overlap with an ongoing investigation being conducted by PSP's vice unit.

ECF No. 59 at 20. In the course of its investigation, the PSP vice unit made consensualized calls

to Sanders with the assistance of the confidential source. *Id.* at 21. Through these calls, the

investigators were able to get a general idea as to when Sanders would next be traveling to Erie.

*Id.* Trooper Matson was present for at least one such call, occurring in late December 2022,

during which he personally heard Sanders tell the CI that he would be coming to Erie with large

amounts of contraband in the near future. *Id.* at 24-25. Trooper Matson's team then investigated

further and discovered that Sanders had booked a flight from Arizona to Cleveland, departing on December 30, 2022 and arriving in Cleveland in the early morning hours of December 31, 2022. *Id.* at 21-22, 24-25.

8.   Based on this information, Matson and the other agents established a surveillance team to track Sanders' movements upon his arrival at the Cleveland airport. ECF No. 59 at 21. Approximately ten (10) agents participated in the surveillance. *Id.* at 22.   To facilitate communication, the agents established a "bridge line," which served as a kind of conference call in which multiple agents could converse among themselves at the same time. Through the use of the bridge line, the surveillance team was able to communicate in real time as the surveillance unfolded. *Id.*

9.   Upon his arrival in Cleveland, Sanders was observed coming out of the gate where his plane had landed. ECF No. 59 at 23.   He then proceeded to the baggage claim area. *Id.*   While in that area, Sanders was observed communicating with another individual who was wearing a black ski mask. At times, the two individuals appeared to be sharing phone information with each other, indicating that they had some sort of relationship. *Id.*

10.   As Sanders and the masked individual waited at the baggage area together, a black female removed one bag from the carousel and began walking away. ECF No. 59 at 23. Sanders approached the woman and appeared to question her about the bag she had claimed. *Id.* After she walked away, Sanders returned to the baggage claim. *Id.*   The masked individual then removed a similar looking bag from the carousel, along with a second piece of luggage. *Id.* Sanders and the masked individual proceeded to the passenger pickup area, where the masked individual was observed placing both pieces of luggage into the trunk of a Honda Civic bearing an Ohio license plate. *Id.* at 23-24.   Sanders then entered the back seat area of the Honda Civic

6

alone, and the vehicle departed the airport with Sanders being the sole passenger. *Id.* at 24, 25-26. From Cleveland, the Honda Civic travelled eastward toward Pennsylvania.

11. Meanwhile, PSP Trooper Gary Knott was stationed along Interstate 90 in a marked police car in western Erie County. ECF No. 59 at 42, 43. Trooper Knott has been a Pennsylvania state trooper for approximately 22 years. *Id.* at 39. He estimates that he has conducted tens of thousands of traffic stops since 1997 and has made approximately 500 drug arrests. *Id.* at 40.

12. On the afternoon of December 30, 2022, in anticipation that he would be working the upcoming midnight shift, Trooper Knott was called to assist in the investigation into Sanders' suspected drug activities. ECF No. 59 at 40. To that end, Trooper Knott was advised that Sanders was the target of an ongoing, large-scale drug investigation, and he was fully briefed on the parameters of that investigation. *Id.* at 27, 40-41. After he began his shift in the early morning hours of December 31, 2022, Trooper Knott was included on the bridge line conference call and could therefore hear the surveilling agents' conversations in real time, as they occurred. *Id.* at 41. He therefore knew the totality of the circumstances involved in the agents' drug investigation. *Id.* at 27.

13. Through the bridge line communications, the surveilling investigators notified Trooper Knott when Sanders left the Cleveland airport. ECF No. 59 at 41. They described the make and model of the Uber vehicle for Trooper Knott and provided the Ohio license plate information. *Id.* at 42. In addition, they advised Trooper Knott that the rear windows of the vehicle and rear windshield were tinted so darkly that they could not see the interior of the car, which Trooper Knott knew to be a violation of the Pennsylvania Vehicle Code. *Id.* at 42, 54.

7

14.   Shortly after 4:00 a.m. on December 31, 2022, Trooper Knott was stationary in his marked cruiser at or near the mile 6 marker on Interstate 90, facing northward from the south side of the roadway, monitoring eastbound traffic.  ECF No. 59 at 42-43.  Because he was participating in the bridge line call, Trooper Knott was able to anticipate when Sanders' vehicle would be approaching his area.  *Id.* at 43.  As he awaited the arrival of the subject Honda Civic, he activated the cruiser's spotlight and "take-down lights"[1] as well as the high beams on his headlights.  *Id.*

15.   When the Honda Civic passed by at approximately 4:09 a.m., Trooper Knott was unable to view the interior of the vehicle, despite the "heavily illuminated" conditions. ECF No. 59 at 43, 48.  Specifically, he noticed that the rear passenger side window and back window were so dark that he could not see through either one.  *Id.* at 44.

16.   Trooper Knott then pulled his cruiser on to the roadway in pursuit.  ECF No. 59 at 44.  By this point, his take-down lights and high beam were deactivated so as not to create a hazard for the driver.  *Id.*  As he got behind the car, Trooper Knott could see that the rear window was "heavily tinted, so much so that [he] wasn't able to even distinguish that there was a silhouette or anything else in the back of the vehicle."  *Id.*  Concluding that the tint violated the Pennsylvania Vehicle Code, Trooper Knott activated his emergency lights and pulled the driver over.  *Id.* at 44-45.

17.   Trooper Knott testified credibly that, as he approached the car on foot:

I still wasn't able to . . . see anything, even though I was on foot right beside it.  I couldn't see any silhouette or anything inside the vehicle.  So I stopped at the pillar in the back and tapped on the window and announced that I would like the driver

---

[1] Trooper Knott explained that "take-down lights" are clear bright LED lights used to heighten the officer's visibility into the back of a car.  ECF No. 59 at 43.

to roll down those windows because I couldn't see inside.   It was . . . a safety concern.  I couldn't see in the back window.

ECF No. 59 at 45.

18.   Once the front and back windows were lowered, Trooper Knott could see that there were only two occupants inside the car -- the driver up front and Sanders, who was sitting in the backseat.  ECF No. 59 at 45.  Trooper Knott introduced himself and explained that the stop was being audibly recorded.  *Id.* at 46.  He asked the driver for his license, registration, and insurance card.  *Id.*  While the driver retrieved that information, Trooper Knott engaged Sanders in conversation and confirmed his identity.  *Id.*

19.   Trooper Knott then invited the driver to sit in the front seat of his cruiser in order to separate him from Sanders and facilitate the vehicle stop.  ECF No. 59 at 46.  Based on information received over the bridge line, Trooper Knott was aware that the suitcases in the car were of particular interest and were believed to contain drugs.  *Id.*

20.   Once in the cruiser, the Uber driver confirmed to Trooper Knott that he had picked up his passenger from the Cleveland airport and that there was luggage in the trunk of his car, including a black bag belonging to his girlfriend.  Govt' Ex. A, MVR at 3:24 to 4:30.  The driver then gave Trooper Knott consent to search both the car and his girlfriend's bag.  *Id.* at 4:30-4:42.

21.   Trooper Knott also spoke with Sanders, who denied having any luggage in the trunk of the car.  MVR at 5:40 to 7:30.

22.   The video recording shows that, when Trooper Knott opened the trunk pursuant to the driver's consent, he found two suitcases there, along with a small black leather bag.  MVR at 7:35 to 8:12. The Uber driver claimed ownership only of the smaller black bag but not the two suitcases.  *Id.*  Sanders again denied that the suitcases in the trunk were his.  *Id.* at 8:05-8:55.

9

23.  After Trooper Knott conferred with the other agents on the bridge line, a drug detection K-9 unit was summoned to the scene.  MVR at 10:05 to 13:45.

24.  At approximately 4:25 a.m., the K-9 handler deployed the drug detection dog on the exterior of the Honda Civic.  ECF No. 59 at 47-48.  Thus, approximately 16 minutes elapsed from the moment Trooper Knott first spotted the Honda Civic until the drug detection canine was deployed.[2]  *Id.* at 48.

25.  When the drug sniff was completed, Trooper Jason Young, the K-9 handler, advised Trooper Knott that the dog had shown a positive response for the presence of drugs.[3]  ECF No. 59 at 47-48.

26.  Sanders was subsequently transported to the Pennsylvania State Police barracks in Girard, Pennsylvania, where he was read his *Miranda* rights and was interviewed.  ECF No. 59 at 61.  Prior to the questioning, Sanders executed a waiver-of-rights form, which the Government entered into evidence as its "Exhibit B."  *Id.* at 61-63.  Trooper Matson was present during the interview, as was Trooper Adam Mourer and Corporal Sweeney.  *Id.* at 61, 64.

---

[2] Trooper Knott testified credibly that the moment when he would typically run a driver's identification through the system and conclude a routine traffic stop occurred at around the 3:25 minute mark of the video recording.  ECF No. 59 at 56. Trooper Knott further testified, and the video confirms, that the drug detection canine was deployed on the uber vehicle at approximately the 14:38 minute mark.  *Id.* at 57.  The interim detention thus amounted to approximately eleven (11) minutes.

[3] As previously noted, hearsay evidence is admissible at a suppression hearing when, as here, the court considers it reliable.  *See United States v. Montalvo-Flores*, 81 F.4th 339, 344 (3d Cir. 2023) ("Though Holmes was at times relaying what other officers saw and told him, "hearsay testimony is admissible at suppression hearings ... and should be considered by a district court if reliable.");  *United States v. Robinson*, 663, F. App'x 215, 218 (3d Cir. 2016) (rejecting claim of plain error based on suppression court's allowance of officer's testimony that another officer had told him the K-9 unit alerted to the presence of drugs in defendant's vehicle).

10

27. Trooper Mourer testified credibly that Sanders was read his *Miranda* rights and then had an opportunity to review the waiver-of-rights form, which he could then sign if he wished. ECF No. 59 at 61. In this case, Sanders signed the waiver form at 5:18 a.m., which was approximately one hour and nine minutes after the initiation of the vehicle stop. *Id.* at 62-63.

28. At the time that Sanders signed the waiver form, Trooper Matson, Trooper Mourer, and Corporal Sweeney were all present with him in the barracks interview room. ECF No. 59 at 61, 64. Each officer was armed, but their weapons were not visible. *Id.* at 64.

29. According to Trooper Mourer, none of the officers threatened Sanders or attempted to intimidate him, nor did they coerce Sanders into providing a statement. ECF No. 59 at 62. Rather, Sanders signed the waiver form of his own free will. *Id.*

30. At no point during the questioning did Sanders express a desire for the interview to end or invoke his right to an attorney. ECF No. 59 at 62-63. Nor did Sanders take any other action that would have required the officers to conclude the interview. *Id.* at 63.

31. While Sanders was at the state police barracks, Trooper Mourer obtained a warrant to search the two pieces of luggage that were removed from the trunk of the Honda Civic. Gov't Exhibit C. The Government alleges that the suitcases were found to contain approximately two kilograms of fentanyl and twenty-eight pounds of methamphetamine. ECF No. 39 at 4-5.

## II.    PROCEDURAL HISTORY

Sanders was subsequently indicted on one count of possessing with intent to distribute fentanyl and methamphetamine, in violation of 21 U.S.C. §§841(a)(1), 841(b)(1)(A)(vi) and 841(b)(1)(A)(viii). He has filed the pending motion to suppress all evidence derived from the vehicle stop on the grounds that the stop was unlawful. ECF No. 35; ECF No. 38 at 1.

11

Sanders' primary argument is that Trooper Knott could not have reasonably believed that the subject Honda Civic was in violation of the Pennsylvania Vehicle Code.  At the suppression hearing, Sanders also posited that, even if the stop was initially lawful, it became unlawful when Trooper Knott unreasonably extended the stop for the purpose of calling in the drug detection canine.  Finally, Sanders suggests that his statements to investigators were involuntary because he had gone "many hours without sleep, food, or the bathroom privilege." ECF No. 35 at 2.

## III.   CONCLUSIONS OF LAW

### A. General Principles

1.  Under the Fourth Amendment, the Government may not engage in "unreasonable searches and seizures[.]" U.S. Const. amend. IV.  To be considered "reasonable" under the Fourth Amendment, a seizure must usually be effectuated pursuant to a warrant issued upon a showing of probable cause.  *United States v. Amos*, 88 F.4th 446, 451 (3d Cir. 2023) (quotation marks and citation omitted).

2.  One exception to the warrant requirement is a valid "*Terry* stop," so named for the Supreme Court's ruling in *Terry v. Ohio,* 392 U.S. 1 (1968).  *See Amos*, 88 F. 4th at 451.  Under the rule of *Terry,* a police officer may conduct a brief, investigatory stop without a warrant (i.e., a "*Terry* stop") if he has a "'reasonable, articulable suspicion that criminal activity is afoot.'" *Id.* (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123, (2000)).  Reasonable suspicion involves more than an "'inchoate and unparticularized suspicion or hunch of criminal activity,'" but it is a less exacting standard than probable cause or a preponderance of the evidence.  *Id.* (quoting *Wardlow*, 528 U.S. at 124); *see Terry*, 392 U.S. at 27.  Because the inquiry is objective, an

officer's subjective motivation for the stop is irrelevant. *See United States v. Smith*, 575 F. Supp. 3d 542, 551 (E.D. Pa. 2021) (citing *Whren v. United States*, 517 U.S. 806, 812-13 (1996)).

3.  In evaluating the reasonableness of a "*Terry* stop," courts utilize a "totality of the circumstances approach," whereby "the whole picture must be taken into account." *United States v. Rivera-Raposo*, Case No. 3:22-cr-199, 2023 WL 6460499, at *7 (M.D. Pa. Oct. 3, 2023) (internal quotation marks and citations omitted). In addition, "courts afford significant deference to a law enforcement officer's determination of reasonable suspicion." *Id.* (internal quotation marks and citation omitted).

4.  "If a Terry stop is conducted without reasonable suspicion of criminal activity, any evidence obtained must be suppressed as 'fruit of the poisonous tree.'" *Amos,* 88 F. 4th at 451 (quoting *Wong Sun v. United States*, 371 U.S. 471, 487–88, (1963)).

B.  The Initial Vehicle Stop

5.  Because reasonable suspicion is evaluated at the moment of a seizure, the first step in a suppression analysis is to determine when the seizure occurred. *Amos*, 88 F. 4th at 451. "A seizure can occur in two ways: 1) 'a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful,' or 2) 'submission to a show of authority.'" *Id.* (citing *United States v. Brown*, 448 F.3d at 245); *see also California v. Hodari D.*, 499 U.S. 621, 626 (1991).

6.  Here, Sanders experienced a "seizure" for Fourth Amendment purposes shortly after 4:09 a.m. on December 31, 2022, when the Uber vehicle in which he was traveling was pulled over by Trooper Knott. *See U.S. v. Hurtt*, 31 F. 4th 152, 158 (3d Cir. 2022) (noting that a traffic stop, "even if brief and for a limited purpose," constitutes a seizure within the meaning of the

Fourth Amendment). Inasmuch as this was a warrantless "seizure," the Government bears the burden of establishing that it was reasonable.[4] *Rivera-Raposo*, 2023 WL 6460499, at *6.

7. Consistent with the rule of *Terry*, "a traffic stop will be deemed a reasonable 'seizure' when an objective review of the facts shows that an officer possessed specific, articulable facts that an individual was violating a traffic law at the time of the stop." *United States v. Delfin-Colina*, 464 F.3d 392, 398 (3d Cir. 2006). "In other words, an officer need not be factually accurate in [his] belief that a traffic law had been violated but, instead, need only produce facts establishing that [he] reasonably believed that a violation had taken place." *Id.* "Consequently, a reasonable mistake of fact does not violate the Fourth Amendment." *Id.* (internal quotation marks and citation omitted).

8. Here, Sanders disputes that Trooper Knott had a valid basis to initiate the traffic stop. The Government has asserted that the Honda Civic's windows were tinted in a manner such that Trooper Knott could not see inside the vehicle, which would be a violation of Pennsylvania's Vehicle Code, 75 Pa. C.S. §4524(e). Sanders posits that, because of the rainy, dark conditions, the position of Trooper Knott's cruiser, and the speed of the Honda as it drove along Interstate 90, Trooper Knott could not have credibly witnessed any unlawful tint as the vehicle passed by. Pointing out that no citation was issued to the Uber driver, Sanders argues that the alleged tint was merely a pretext for the broader drug investigation. He concludes that, absent any credible basis for suspecting that the Honda Civic was in violation of 75 Pa C.S. §4524(e), all evidence obtained as a result of the stop must be suppressed.

---

[4] A defendant challenging a search or seizure typically bears the burden of proving that it was illegal. *United States v. Rivera-Raposo*, Case No. 3:22-cr-199, 2023 WL 6460499, at *6 (M.D. Pa. Oct. 3, 2023). "However, once the defendant has established a basis for his motion, *i.e.*, the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *Id.* (citation and internal quotation marks omitted).

9.  Sanders' challenge is unpersuasive, as the Court finds by a preponderance of the evidence that there was in fact a lawful basis for conducting a vehicle stop based on a violation of 75 Pa. C.S. §4524(e).  To that end, the Court credits Trooper Knott's testimony that the tinting of the rear windows and rear windshield of the Honda Civic was dark enough to obstruct his view into the car, in violation of the Pennsylvania Vehicle Code.  In crediting Trooper Knott's testimony, the Court notes that he is an experienced police officer who has conducted thousands of vehicle stops and is therefore in a position to recognize when a violation of Section 4524(e) has occurred.  Further, Trooper Knott had at least three opportunities to observe the vehicle in question:  first as it passed by on Interstate 90, second as he pulled behind the car and followed it, and third as he approached the car on foot and stood next to it.  In addition, Trooper Knott's testimony is consistent with the reports of other agents who had reported an unlawful window tint while surveilling the car at the Cleveland airport. As for the video recording of the stop, the Court finds that this evidence is neither conclusive nor contradictory on the matter of unlawful window tint.  The video does *not* capture Trooper Knott's view of the vehicle as it initially passed by, at which time Trooper Knott had activated his high beams, spotlight and take-down lights.  Nor does the recording afford a clear view of the rear passenger side windows, which are alleged to have been unlawfully tinted.  The video *does* depict a view of the Honda Civic as Trooper Knott followed the car and ultimately parked behind it.  From this angle, the rear windshield is visible and certainly appears too dark to permit a view into the car; however, it is difficult to tell from the video whether this obstruction is the result of tint or atmospheric conditions such as rain and darkness.  Still, the video does not contradict the account of Trooper Knott who, unlike the Court, had an opportunity to stand next to the car from different angles with the benefit of his flashlight and lighting from his cruiser.  Finally, the Court notes that there

15

has not been any *Franks* challenge to the search warrant affidavit, which discusses the unlawful tint on the windows of the Uber vehicle as a basis for the vehicle stop. *See* Govt. Ex. C. In sum, based on its review of the record, the Court is persuaded that Trooper Knott had an objectively legitimate basis for conducting the vehicle stop because the vehicle was in violation of 75 Pa. C.S. §4524(e).

10. The Court's conclusion in this regard is not altered by the fact that the Uber driver was not issued a citation for the Vehicle Code infraction. It is clear from the video recording that Trooper Knott advised the driver of the infraction and, in that respect, the driver was given a verbal warning. That the officers focused their attention on the potential felony drug violation and released the driver without issuing a ticket or citation for the window tint is not particularly surprising, nor does it disprove the violation of Section 4524(e).

11. To the extent Sanders is making a slightly different argument -- *i.e.*, that Trooper Knott lacked any opportunity to *observe* or *suspect* the vehicle code violation, the Court rejects this challenge as well. As noted, Sanders' primary argument has been that Trooper Knott could not have credibly observed any unlawful window tint as the Honda Civic sped past him in the darkness. But even if that were true, it would not change the outcome because, as mentioned, the Court credits Trooper Knott's testimony that he had been informed by other surveillance officers on scene at the Cleveland airport that the Uber vehicle had tinted windows in violation of Section 4524(e). A police officer is generally entitled to rely on information conveyed by other officers. *United States v. Yusuf*, 461 F.3d 374, 385 (3d Cir. 2006) (unlike other informant tips, "information received from other law enforcement officials during the course of an investigation is generally assumed to be reliable"). And a reasonable officer in Trooper Knott's position could assume that multiple officers surveilling Sanders at the airport pick up area would have had

16

ample opportunity to view the features on the subject Honda Civic, including the presence of unlawful window tint. Thus, the Government has produced credible facts establishing a reasonable, articulable basis for believing that a vehicular code violation had taken place." *Fleetwood*, 235 F. App'x at 895; *Delfin-Colina*, 464 F.3d at 398. Additionally, as discussed, the Court credits Trooper Knott's testimony that he was still unable to see inside the car, even when he approached it on foot and stood next to it. Based on these determinations, the Court is satisfied by a preponderance of the evidence that Trooper Knott had an objectively reasonable basis for suspecting a Vehicle Code violation and conducting a stop of the Honda Civic in which Sanders was travelling.

     12. Finally, even if there were no objectively reasonable grounds to suspect that the subject Honda violated the provisions of Section 4524(e), the Government has proven that Trooper Knott had an objectively reasonable suspicion that Sanders was engaged in illegal drug trafficking activity at the time he pulled the Honda Civic over. On this point, the Court credits Trooper Knott's testimony that, prior to effectuating the traffic stop, he was aware of the parameters of the investigation concerning Sanders' suspected involvement in a large-scale drug operation. As discussed above, this included reliable information that:

    a)  Sanders had been indicted in an earlier drug trafficking case;

    b)  a reliable source had provided information that Sanders was trafficking large amounts of methamphetamine and fentanyl from Arizona, where he was then residing;

    c)  this same source indicated that Sanders typically moved the drugs in suitcases flown from Arizona to Cleveland, then transported the suitcases from Cleveland to Erie via Uber or rideshare, sometimes with the use of couriers;

    d)  Sanders' recent flight history was consistent with the patterns utilized by drug traffickers;

e) Sanders had been heard in a recorded conversation discussing his plans to bring controlled substances to the Erie area in the near future;

f) Sanders had arrived at the Cleveland airport in the early morning hours of December 31, 2022 on a flight from Arizona, as anticipated;

g) at the baggage claim area, Sanders had met up with a fellow passenger who was wearing a ski mask, which could be viewed as an effort to avoid identification;

h) Sanders and the masked individual appeared to know each other and appeared to be communicating and showing each other their phones;

i) the masked individual had retrieved two pieces of luggage from the baggage claim area, and then proceeded to the ride pick-up area where he placed the suitcases into the trunk of a Honda Civic without getting into the car;

j) Sanders had never handled the luggage, yet entered the Honda Civic as the sole passenger in the vehicle that contained the luggage;

k) Sanders' behavior in the early morning hours of December 31, 2022 could be construed as consistent with the actions of a drug courier.

13. Based on the foregoing circumstances, Trooper Knott had an objectively reasonable and articulable suspicion that Sanders was transporting illegal drugs into Pennsylvania at the time of the vehicular stop. *See United States v. Carter*, No. 22-3395, 2024 WL 195475, at *3 (3d Cir. Jan. 18, 2024) ("Police may briefly stop a suspect when the officer has 'reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony.'") (quoting *United States v. Hensley*, 469 U.S. 221, 229 (1985)).

14. The initial vehicle stop therefore did not violate the Fourth Amendment.

C. The Extended Delay

15. Even if an initial traffic stop is lawful, it may become unlawful if it is prolonged beyond the time reasonably required to complete the mission of the initial traffic stop. *United*

18

*States v. Hurtt*, 31 F.4th 152, 159 (3d Cir. 2022) ("[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures.") (quoting *Rodriguez v. United States*, 575 U.S. 348, 350 (2015)). "An unreasonable extension occurs when an officer, without reasonable suspicion, diverts from a stop's traffic-based purpose to investigate other crimes." *United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018).

16.   Actions such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance" are "ordinarily incident to a traffic stop." *Hurtt*, 31 F. 4th at 160 (citing *Rodriguez*, 575 U.S. at 355). And, "[w]hen evaluating whether an officer was on-mission, we consider the 'legitimate and weighty' interest in officer safety' and thus will tolerate additional intrusions, such as forcing a driver to get out of a vehicle." *Id.* (quoting *Rodriguez*, 575 U.S. at 356). But "police may not vary from the original mission and thereby create an exigency to support the resulting delay and any subsequent arrest." *Id.*

17.   The Court's inquiry under *Rodriguez v. United States* proceeds in two steps. *United States v. Stewart*, No. 22-3014, 2024 WL 390109, at *3 (3d Cir. Feb. 2, 2024); *Hurtt*, 31 F.4th at 159. First, the Court must determine the moment when the vehicle stop was measurably extended, sometimes referred to as the "*Rodriguez* moment." *Stewart*, 2024 WL 390109, at *3; *Green*, 897 F.3d at 179. Second, the Court must determine "whether the facts available to the officer up to that moment established reasonable suspicion of criminal activity." *Stewart*, 2024 WL 390109, at *3. "The extension of the traffic stop is lawful only if, at the time of the extension, the officer already had reasonable suspicion." *Id.*

18.  Here, Trooper Knott testified that, during a typical traffic stop, he will check the driver's license, registration and insurance, and perform a VIN check.  ECF No. 59 at 55.  After those tasks are completed, he will generally release the driver if no special problems occur.  *Id.*  In this case, Trooper Knott identified minute 3:25 on the video recording as the approximate moment when he would ordinarily have run the driver's identification through the system.  *Id.* at 56.  At that point in the video, he was in possession of the driver's identification and was seated in his cruiser, where he could check for any extant driving restrictions or outstanding warrants.  *Id.* The Court credits this testimony and concludes that the "*Rodriguez* moment" in this case occurred at approximately the 3:25 minute mark on the video recording.

19.  As of that point in time, the facts available to Trooper Knott were sufficient to support a reasonable suspicion that Sanders was transporting large quantities of drugs back to Erie, for all of the reasons previously stated.  Indeed, because Trooper Knott had been briefed on the ongoing drug trafficking investigation prior to the vehicle stop, he had the requisite reasonable suspicion from the outset.  Thus, "a reasonable, trained officer standing in [Trooper Knott's] shoes" would be able to "articulate specific reasons justifying the extension of the stop." *Stewart*, 2024 WL 390109, at *3.

20.  Nevertheless, Sanders contends that the length of his detention while awaiting the arrival of the drug K-9 unit was unnecessarily long and violated his Fourth Amendment rights.  In essence, he seems to be arguing that the traffic stop evolved into a "*de facto* arrest."

21.  "In 'distinguishing an investigative stop from a *de facto* arrest,' the touchstone is whether the defendant was detained longer than necessary for the police to conduct their investigation." *United States v. Carter*, No. 22-3395, 2024 WL 195475, at *3 (3d Cir. Jan. 18, 2024) (quoting *United States v. Sharpe*, 470 U.S. 675, 685, 687 (1985)).  "The duration and

nature of the stop must be 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)).

22.   However, there is "no rigid time limitation on *Terry* stops." *Sharpe*, 470 U.S. at 685; *see Brown v. City of Phila.*, Civil Action No. 07-0192, 2008 WL 269495, at *7 (E.D. Pa. Jan. 29, 2008). "In assessing whether a detention is too long in duration to be justified as an investigative stop," courts "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Sharpe*, 470 U.S. at 686.

23.   Here, Trooper Knott testified that the drug detection canine was deployed on the Honda Civic at approximately 14:38 minutes into the recording. ECF No. 59 at 57. The video generally confirms this estimate, with the dog first appearing at minute 14:37 and beginning to circle the vehicle at approximately the 14:50 minute mark.[5] Given that the "*Rodriguez* moment" in this case occurred at approximately the 3:25 minute mark on the video, the Court concludes that the "*Rodriguez* extension" involved a period of just over 11 minutes from the time Trooper Knott concluded the tasks normally incident to a traffic stop until the drug detection canine arrived and was deployed on the vehicle. More broadly, the video shows that the dog was deployed within approximately 15 minutes from the time the vehicle was first pulled over. Further, Sanders' attorney concedes that the "whole encounter," as depicted on the video, lasted

---

[5] As the dog circles the vehicle three times, it can be seen on each occasion attempting to enter the trunk area of the car. At approximately the 16:53 mark, Trooper Young can be faintly heard on the video recording conveying to Trooper Knott that the dog positively alerted to the trunk area of the car. Given the evidence on the video, along with Trooper Knott's credible testimony that the canine officer confirmed a positive alert to controlled substances, the Court rejects Sanders' suggestion that there is insufficient evidence of the dog alerting. As noted herein, the Court can consider reliable hearsay evidence in resolving a suppression motion. *See United States v. Montalvo-Flores*, 81 F.4th 339, 344 (3d Cir. 2023); *United States v. Robinson*, 663, F. App'x 215, 218 (3d Cir. 2016).

approximately forty (40) minutes.  ECF No. 59 at 5.  Under the facts of this case, the Court finds

that any added delay occasioned by the officers' deployment of the drug detection canine was

reasonable as a matter of law and, consequently, did not violate the Fourth Amendment.  *See,*

*e.g., United States v. Frost,* 999 F.2d 737, 741-42 (3d Cir. 1993) (eighty-minute delay pending

arrival of canine did not render the investigative detention of defendant's suitcase unlawful);

*United States v. Wilkenson,* No. 3:22-CR-113, 2023 WL 5103364, at *11 (M.D. Pa. Aug. 9,

2023) ("While close to the limit, the eighty-two minute delay from when Trooper Powell tried to

request a canine unit until a canine unit arrived was not unreasonable."); *Brown,* 2008 WL

269495, at *7 ("Generally, . . . courts have found that stops lasting an hour or less do not exceed

*Terry's* bounds"); *United States v. Leal,* 385 F. Supp. 2d 540, 545 (W.D. Pa. 2005) (arrival of

canine unit approximately 45 to 60 minutes after it was requested, which resulted in a detention

of at least 80 minutes, did not unlawfully exceed the permissible scope of a *Terry* stop), *aff'd,*

235 F. App'x 937 (3d Cir. 2007).

    24.  Once the drug detection canine positively alerted to the luggage in the trunk, based

on the totality of their investigation up to that point, the officers had probable cause to further

extend their detention of Sanders while they obtained a search warrant for the unclaimed

luggage.  *See, e.g., United States Nasir,* 17 F. 4th 459, 466-67 (3d Cir. 2021) (police had probable

cause to arrest the defendant for drug related crimes where, at the time of arrest, officers knew

the defendant's history of drug dealing; defendant had reportedly engaged in suspicious activity

at a particular storage unit, including making numerous trips to the storage unit, sometimes

several in a day; the owner had taken a photograph that showed items in the unit consistent with

drug distribution; an officer had seen the defendant put a bag in the back of his car and drive

toward the storage facility; and a narcotics dog had positively alerted to drugs at the unit);

*Karnes v. Skrutski,* 62 F.3d 485, 498 (3d Cir. 1995) ("[I]t is clear that the drug's dog's alert would present probable cause for a search."); *United States v. Massac,* 867 F.2d 174, 176 (3d Cir. 1989) ("When the alert was given by the dog, we are satisfied that, at least when combined with the other known circumstances, probable cause existed to arrest.").

    D.  Sanders' Waiver of *Miranda* Rights and Statements to Police Officers

    25.  Lastly, Sanders moves to suppress the statements he made to investigators while at the PSP barracks. Though not developed by the parties in their briefing, the Court assumes that Sanders is alleging a violation of his Fifth Amendment rights, which provides, in relevant part, that "[n]o person ... shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V.

    26.  In *Miranda v. Arizona,* 384 U.S. 436 (1966), the Supreme Court "established a procedure for custodial interrogation designed to protect a detainee's Fifth Amendment right against self-incrimination." *Boyer v. Houtzdale,* 620 F. App'x 118, 124 (3d Cir. 2015). "Pursuant to this procedure, law enforcement must notify a suspect of the following Miranda warnings prior to any questioning: (1) that the suspect 'has the right to remain silent'; (2) 'that anything he says can be used against him in a court of law'; (3) 'that he has the right to the presence of an attorney'; and (4) 'that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" *United States v. Ventura Amparo,* No. 22-CR-430, 2023 WL 8548558, at *5 (E.D. Pa. Dec. 11, 2023) (quoting *Miranda,* 384 U.S. at 479). "These Miranda warnings need not be given in the exact form described in the Supreme Court's 1966 opinion — '[t]he inquiry is simply whether the warnings reasonably convey to a suspect his rights as

required by Miranda.'" *Id.* (quoting *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989) (cleaned up)).

27.  When the Government seeks to admit statements made by a suspect during a custodial interrogation, "[t]he government has the burden of proving by a preponderance of the evidence that a defendant was advised of his/her rights and voluntarily and knowingly waived them." *United States v. Lin*, 131 F. App'x 884, 886 (3d Cir. 2005) (citing *Lego v. Twomey*, 404 U.S. 477 (1972)). The Court's evaluation must be made based on the totality of circumstances. *See United States v. Rought*, 11 F. 4th 178, 187 (3d Cir. 2021) ("A waiver of the Miranda rights must be voluntary, knowing, and intelligent considering the totality of the circumstances.").

28. "A waiver is voluntary if 'it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.'" *Rought,* 11 F. 4th at 187 (quoting *Colorado v. Spring,* 479 U.S. 564, 573 (1987)).  "In the voluntariness inquiry, '[a] suspect's background and experience, including prior dealings with the criminal justice system, should be taken into account.'" *Id.* (quoting *United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005)) (alteration in the original).

29. "A waiver is knowing and intelligent if 'made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Rought*, 11 F. 4th at 187 (quoting Spring, 479 U.S. at 573).

30. "If the Government 'shows that a Miranda warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent.'" *Rought*, 11 F. 4th at 187 (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010)).

31. Here, the prosecution has produced a PSP "Rights Warning and Waiver" form, which Sanders signed prior to questioning. *See* Govt. "Exhibit B." The form advises:

> You have an absolute right to remain silent and anything you say can and will be used against you in a court of law. You also have the right to talk to an attorney before and have an attorney present with you during questioning. If you cannot afford to hire an attorney, one will be appointed to represent you without charge before questioning, if you so desire. If you do decide to answer questions, you may stop any time you wish and you cannot be forced to continue.

Govt. Ex. B.

Underneath this explanation of rights is a "waiver" paragraph, which reads:

> I fully understand the statement warning me of my rights and I am willing to answer questions. I do not want an attorney, and I understand that I may stop answering questions any time during the questioning. No promises have been made to me, nor have I been threatened in any manner.

*Id.*

32. As is evident from the above quoted language, the form adequately apprised Sanders of his Fifth Amendment rights in compliance with *Miranda* and also warned him of the consequences of waiving those rights.

33. At the suppression hearing, Trooper Mourer provided credible testimony concerning the circumstances of Sanders' interview. Based on that testimony, the Court finds that Trooper Mourer was present during the initiation of Sanders' interview process and that, consistent with Trooper Mourer's usual practice, Sanders was read his *Miranda* rights "verbatim" and was then given an opportunity to review the waiver form himself and sign it if he so chose. ECF No. 59 at 61. Sanders *did* sign the form at 5:18 a.m. on December 31, 2022, which was approximately 1 hour and 9 minutes after his Uber vehicle was stopped by Trooper Knott. Govt. Ex. B; ECF No. 59 at 62-63.

34.  The Court finds that Trooper Mourer, Trooper Matson, and Corporal Sweeney were all present in the PSP barracks interview room when Sanders signed the waiver form.  ECF No. 59 at 61, 64.  Each officer was armed, but none of their weapons were visible.  *Id.* at 64.  The Court finds that no officer threatened Sanders or attempted to intimidate him, nor did they coerce Sanders into providing a statement.  *Id.* at 62.  Rather, Sanders signed the waiver form of his own free will.  *Id.*  The Court further finds that, throughout the interview, Sanders never expressed a desire for the questioning to end, nor did he invoke his right to an attorney or otherwise attempt to terminate the interview.  ECF No. 59 at 62-63.

35.  The Court also considers the fact that Sanders was an adult at the time he executed the waiver form and that he has had prior experience with the criminal justice system.  The video recording of the stop shows him to be an articulate individual.  There is no allegation that he is illiterate or incapable of understanding his rights, and the evidence of record seems to suggest the opposite.  In fact, Sanders' only allegation in support of his Fifth Amendment challenge is that he "made statements after many hours without sleep, food, or the bathroom privilege."  ECF No. 35 at 2, ¶10.

36.  Even crediting Sanders' allegation, the Court finds that the Government has satisfied its burden of proving by a preponderance of the evidence that Sanders was advised of his rights, that he comprehended his rights, and that he made an uncoerced choice to waive his rights.  Because the Government has demonstrated that Sanders waived his rights knowingly, intelligently, and voluntarily, without coercion, Sanders' statements to the agents will not be suppressed.

## IV.     CONCLUSION

Based upon the foregoing findings of fact and conclusions of law, the Defendant's

motion to suppress will be denied.

An appropriate order follows.


SUSAN PARADISE BAXTER
United States District Judge

27